UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

KIRK DAVID MARSH, KIRK
RUSSEL MARSH AND MARSH
INVESTMENT GROUP, LLP                                    PLAINTIFFS

VS.                              CIVIL ACTION NO. 4:07CV60TSL-JCS

ALDEN M. WALLACE III,
PRISCILLA P. WALLACE, NELL
WALLACE, WALLACE RENTALS, LLC,
HAROLD WRIGHT, RICHARD O'DOM,
JOHN HOWELL AND HOWELL LAW FIRM                          DEFENDANTS

MEMORANDUM OPINION AND ORDER

In 2006, plaintiffs Kirk David Marsh, Kirk Russel Marsh and

Marsh Investment Group, LLP entered into a $4.9 million

transaction with defendant Alden "Bubber" Wallace for the purchase

of approximately 150 residential rental properties which Wallace

owned in Meridian and Quitman, Mississippi.  After their purchase,

plaintiffs came to believe they had been duped into purchasing the

properties based on misrepresentations by Bubber Wallace, his wife

Priscilla "Missy" Wallace, and by defendant Richard O'Dom, as to

the historical monthly income of the properties.  They filed this

lawsuit seeking to recover damages against these three defendants

for fraud, negligent misrepresentation and conspiracy.  In

addition, they have sued O'Dom for violating Mississippi Code

Annotated § 73-35-1, which prohibits acting as a real estate

broker without a license, and they have sued John Howell, the

"closing attorney" for the transaction, alleging claims for breach of fiduciary duty and negligence. The case was tried to the bench over a period of eight days in January and March 2009, and the court, based on the evidence adduced at trial, makes the following findings and conclusions.

Alden Wallace first became involved in the residential rental business in Meridian, Mississippi in the mid-1980s. Over time, he acquired around 150 rental properties in Meridian and Quitman, Mississippi, including two mobile home parks, Valley Mobile Home Park in Meridian, and Robinson Court Mobile Home Park in Quitman. These properties were held in a number of limited liability companies (LLCs) owned by Wallace and his wife, Missy. In December 2000, the United States Department of Justice filed suit against the Wallaces, alleging that they and the LLCs had engaged in a pattern or practice of race discrimination in the operation of their residential rental business, in violation of the Fair Housing Act, 42 U.S.C. § 3601 _et_ _seq._ A Consent Order was entered in the case in 2002, under the terms of which the Wallaces were barred from active involvement in the management of the rental properties and were required instead to manage the properties through a management company. They were further required to provide the government with notice of any sale or acquisition of rental property.

Before the litigation with the Government and entry of the Consent Order, the Wallaces had managed the properties themselves, with Missy Wallace primarily responsible for handling the day-to-day affairs of the businesses, from showing properties, collecting rents, arranging for repairs and interacting with tenants, to managing the finances, including keeping up with payment of bills and mortgages. The Wallaces did not consider the prospect of running their businesses through a manager or management company appealing, so when the Consent Order was entered prohibiting their further direct involvement in managing the business, the Wallaces decided to try to sell the properties. At that time, the Wallaces thought they had a buyer, Bert Rossini, and they began preparations for closing on a sale, including having title work done on the properties by John Howell, a lawyer who regularly performed legal work for the Wallaces. Ultimately, however, the sale did not materialize. In the meantime, while still desirous of selling, the Wallaces managed the properties through a succession of managers or management companies; each was eventually fired, because Bubber Wallace thought they were stealing from him.

In 2005, plaintiffs Kirk Marsh and Russel Marsh, father and son, formed Marsh Investment Group, LLP in Virginia, where they lived, for the purpose of investing in real property. At the time, Russel, a graduate of Brigham Young University, had been

employed in the banking industry for approximately three years, where he gained experience with mortgage lending and commercial lending on real estate and became interested in pursuing real estate investing with his father. Kirk Marsh's experience was primarily as a consultant in project management and contract management. He did have a law degree from George Washington University, but he had never actively practiced law. Kirk Marsh also had a real estate appraiser's license and had done some real estate appraisal work in Virginia for his wife's appraisal business.

After forming Marsh Investment Group, Russel began looking for investment opportunities. In December 2005, he came across a listing on the internet by a Phil Coggins for some rental properties owned by Alden "Bubber" Wallace in Meridian, Mississippi. Russel contacted Wallace by phone in January 2006 to get financial information on the properties, and was told to contact Michael Williams, the manager of the properties at that time. Russel contacted Williams, who in turn directed him to Richard O'Dom. O'Dom, the evidence showed, had been a banker (including bank president and owner) for more than thirty years, was a long-time close friend of Bubber Wallace and for some two years had been helping Wallace to try to refinance the debt on Wallace's rental properties. Toward that end, O'Dom, on Wallace's behalf, had engaged George Robertson of the Lincoln Capital Group

in Dallas to work on getting Wallace's loans on his rental properties consolidated and refinanced, with the hope and expectation that this would make them more readily marketable.

After speaking with Michael Williams, Russel contacted O'Dom to request financial information on the properties. Upon learning of Russel's interest in properties, O'Dom initially requested that Russel provide personal financial statements, and in turn, Russel was provided, at O'Dom's direction, a copy of a loan submission package that had been generated by Lincoln Capital in connection with the effort to get refinancing for the Wallace properties. Included in the loan submission package were a number of documents purporting to set forth, among other information, rental income and expenses for the preceding twelve months on the properties in each of four LLCs owned by Wallace, referred to as "Trailing 12s."

After receiving and reviewing the materials in the loan submission package, the Marshes were interested in pursuing the properties as an investment opportunity and communicated their preliminary interest to Bubber Wallace in a letter dated March 6, 2006. On March 22, the Marshes traveled to Meridian and met with Bubber Wallace and O'Dom, who drove them by most of the rental properties and took them to dinner, where they discussed the properties and Wallace's rental business. When the Marshes explained they would need on-site management for the properties and inquired whether Wallace would be interested in handling the

management for them, Wallace told them about the Consent Order, which prohibited his involvement in management of the properties. The Marshes – Kirk Marsh in particular – wanted to know more about the Consent Order, so arrangements were made to meet the following day with Sam Wilkins, the attorney who had represented the Wallaces in the Government's suit against them. After the meeting with Wilkins, which was attended by the Marshes, Wallace and O'Dom, the Marshes returned to Virginia, still very interested in pursuing a purchase of the properties.

The parties continued in regular communication over the next few weeks, and on April 14, apparently in response to a request for financial information, Russel Marsh received from Bubber Wallace an e-mail which attached a Statement of Business Equities and a Trailing 12 Statement on the LLCs covering March 2005 through February 2006, together with Wallace's explanation that he would have the March 2006 figures prior to Kirk Marsh's planned trip to Meridian the following week. During Kirk Marsh's visit to Meridian, he was given a Trailing 12 Statement on each LLC, a combined Trailing 12 Statement, rent rolls for each of the LLCs, and a Statement of Business Equities on each of the LLCs, signed by Bubber Wallace, and reciting: "The foregoing statement of my business financial position, and the related statements thereto were prepared internally and without audit, and are true, correct and complete to the best of my knowledge and belief." He was also

told that financial data on the properties was kept in the files on the various properties that were maintained at the business office at Valley Mobile Home Park, which he was welcome to review at any time.

The combined Trailing 12 reflected that Wallace's properties had generated $667,685.73 in net rental income (not including sales of property), with operating expenses of $319,192.60, so that net operating income, according to the Marshes' calculation, would have been $348,493.13. Initially, Kirk Marsh had some questions about the meaning of certain of the categories on the Trailing 12s and asked Bubber Wallace to explain them; Mr. Wallace responded by referring him to Missy, who apparently was able to answer Mr. Marsh's questions to his satisfaction. Mr. Marsh also went to the Valley Mobile Home Park office to review the documents in the files in an effort to confirm the information in the Trailing 12s, but he abandoned this effort shortly after he began as he found he could not determine much from the records he reviewed and could not reconcile the information in the internal documents with the figures on the Trailing 12s. Nevertheless, according to the Marshes, they did analyze the financial documents that had been provided – the Trailing 12s and rent rolls – and concluded that, based on the historical performance of the properties, the rental income would be sufficient to cover expenses and debt service they estimated would be associated with

the purchase. They decided to go forward with the purchase at Mr. Wallace's asking price of $4.9 million.

On May 6, 2006, the Marshes signed a purchase agreement for the properties that had been prepared by Bubber Wallace's attorney, Bill Ready. Wallace recommended to the Marshes that attorney John Howell do the title work on the properties, and possibly close the transaction, because he had previously done title work on the properties, and in a visit to Meridian in early June, Russel Marsh were taken to Howell's office and introduced to him by O'Dom. Russel met with Howell briefly and discussed with Howell his doing the title work for the transaction.

On that same visit to Meridian, O'Dom introduced Russel Marsh to Kyle Covington of Commercial Bank in Meridian, since Russel had indicated that he and his father were interested in finding a local bank where they could maintain a business account once they had purchased the properties. In addition, after O'Dom and James Robertson determined in discussions with Russel that the lender he and his father were considering to finance their purchase was not a viable option, O'Dom introduced Russel to another local banker, Charles Young with Citizens Bank in Meridian, as a potential lender for their purchase.

In the discussions with Young, it became apparent to Russel and O'Dom that the Marshes would not be able to acquire financing for the purchase from Citizens Bank. O'Dom conveyed to Wallace

that the Marshes were having difficulty securing financing, and in response, Wallace suggested that the Marshes assume the existing debts on the properties and give Wallace a note on the remainder of the $4.9 million purchase price, to which the Marshes agreed. Around this time, Russel Marsh became concerned that if they were to purchase the properties outright, there could be a problem with due-on-sale clauses in the existing mortgages on the properties, and decided that instead of buying the properties directly, they should purchase the LLCs in which the properties were held. So, by mid-June, the parties' transaction had changed from a direct purchase of the properties with lender financing for the entire purchase, to a purchase of the LLCs, with assumption of existing debt and seller financing of the remainder of the purchase price. This was communicated either by Wallace or O'Dom to Howell, who was then contacted by Kirk Marsh to draft agreements transferring ownership of the LLCs from Wallace to the Marshes. Howell obtained from attorney William Ready a copy of a form transfer agreement, and conformed it for the Wallace/Marsh transaction. Howell sent a draft of the agreement to Kirk Marsh, who made revisions and returned it to Howell, and they eventually arrived at a final version to be executed by the parties.

In the meantime, Wallace advised the Marshes that in order to avoid objections to the transaction by the Department of Justice, the parties would need to close on the transaction before the end

of June. When Russel Marsh arrived in Mississippi in late June for the closing, Wallace told him that he had a number of obligations that needed to be paid up front (including a $445,000 loan to Commercial Bank), for which the Marshes would need a loan. Thus, the following day, Wallace and O'Dom took Russel to meet again with Kyle Covington of Commercial Bank to discuss the Marshes' obtaining a loan from Commercial Bank to pay off Wallace's loan to the bank and to pay other debts.

Although that financing issue had not been resolved, on June 27, the parties had what they have termed a "dry closing" (because no money changed hands), in which the Marshes signed the transfer agreements for the LLCs, and the parties signed a HUD-1 Settlement Statement that John Howell had prepared. Attached to the HUD-1 statement executed by the Marshes was a list of debts that Wallace paid from the funds that were payable to him, which included payments of $36,000 to John Howell, $150,000 to Richard O'Dom, $25,568.99 to Rea, Shaw, Giffen & Stuart (Wallace's accounting firm), $36,000 to William Ready, and $7,500 to attorney Sam Wilkins. The following day, June 28, Russel and O'Dom went to Howell's office, where Russel signed a promissory note to Wallace, and in addition, signed three promissory notes in favor of Missy Wallace, Nell Wallace (Bubber's mother) and Harold Wright, which Russel has claimed Wallace told him was necessary to "clean up" issues with the Justice Department. At that point, the Marshes

considered that they owned and were responsible for the properties.

The Marshes lived in Virginia and needed a local professional management company, and hired Eva Green and her company, EDG Associates, to manage the property for them. Green had been suggested to them in April by Wallace, who in April had himself hired her to manage the properties after he fired Michael Wallace, allegedly for theft. Thus, Ms. Green continued to manage the properties after the Marshes took over their ownership following the June dry closing. Shortly after that closing, Wallace informed Russel that certain loans on the properties were past due by $30,000 and needed to be brought current to avoid foreclosure. Russell wired Green $30,000 to bring the loans current.

Meanwhile, the Marshes were approved for an $850,000 loan and were planning to travel to Meridian in late July for the final closing (the "wet" closing). When they arrived in Meridian, however, Howell informed them that they would need an additional $280,000 in funding to close because there were additional debts that Wallace needed to pay. The Marshes scrambled to raise the additional funds, which they were able to do, for the most part: Commercial Bank agreed to increase its loan to Marsh Investment Group from $850,000 to $950,000, which it required that the Marshes personally guarantee, and Citizens Bank agreed to loan the Marshes $150,000. The Marshes had to pay the balance of the

difference, $34,460.34, out of pocket. Thus, ultimately, the Marshes closed on the transaction, agreeing to pay the $4.9 million purchase price together with $19,825 in closing costs, less $20,192.32, which was Wallace's pro-rated share of the 2006 taxes, as reflected on the HUD-1 Settlement Statement signed at the July closing. The Marshes, who had previously paid $50,000 in earnest money, paid the additional $34,460.34 in cash, and signed notes for the balance of the purchase to Commercial Bank for $950,000 and to Citizens Bank for $150,000, leaving them owing $3,715,172.34. Of that amount, they assumed $1,809,480.98 in existing debt, and executed a note in Wallace's favor on the remaining balance of $1,905,691.36. Just as with the June HUD-1 statement, the July HUD-1 statement included as an attachment the list of debts that Wallace intended to pay from the funds that were payable to him, including $36,000 to Howell, $150,000 to O'Dom, $25,568.99 to Rea Shaw, $36,000 to Ready, and $7,500 to Wilkins.

Following the closing, the Marshes experienced significantly less rental income from the properties than they had anticipated based on the historical income figures represented in the Trailing 12s and had difficulty covering expenses and making loan payments. In fact, whereas their agreement called for them to make an initial payment to Wallace of $20,000 and monthly payments of $12,000, the Marshes made a single payment to Wallace of $14,000

(which represented the proceeds of an insurance payment for a rental property that had burned), and no other payments. For several months, Wallace and O'Dom were in regular (constant) contact with the Marshes concerning what they perceived as Green's/the Marshes' poor management of the business and the Marshes' failure to keep their loan payments current (both on assumed debts and the note to Wallace). Additionally, O'Dom worked with Russel in an effort to help the Marshes refinance and consolidate the debt on the properties. However, in December, Wallace informed the Marshes that if they did not bring their note current, he would foreclose on the properties; and when they failed to do so, he followed through, and foreclosed on the properties in February 2007. Not long thereafter, in May 2007, the Marshes filed the present action, alleging, inter alia, that they were the victims of fraud and/or negligent misrepresentation in the transaction. More particularly, plaintiffs charge that the Trailing 12s on which they relied to evaluate the financial position of Wallace's rental businesses and in making their decision to purchase the businesses, falsely inflated the rental income of the businesses and that Bubber Wallace, Missy Wallace and O'Dom either knew the Trailing 12s were false or were at least recklessly ignorant of whether they were true of false. Plaintiffs relatedly charge that they were defrauded pursuant to a conspiracy between Bubber Wallace, Missy Wallace and Richard

O'Dom.  Having thoroughly considered the evidence and arguments of the parties, the court finds and concludes that plaintiffs have failed to sustain their burden to prove their misrepresentation or conspiracy claims against Bubber Wallace, Missy Wallace and Richard O'Dom.

To establish a prima facie case of intentional misrepresentation, a plaintiff must show each of the following elements, by clear and convincing evidence:

> (1) a representation (2) that is false (3) and material (4) that the speaker knew was false or was ignorant of the truth (5) combined with the speaker's intent that the listener act on the representation in a manner reasonably contemplated (6) combined with the listener's ignorance of the statement's falsity (7) and the listener's reliance on the statement as true (8) with a right to rely on the statement, and (9) the listener's proximate injury as a consequence.

Moran v. Fairley, 919 So. 2d 969, 975 (Miss. Ct. App. 2005) (citing Southeastern Med. Supply, Inc. v. Boyles, Moak, and Brickell Ins., Inc., 822 So. 2d 323 (Miss. Ct. App. 2002)).  As the Marshes correctly note, to prove an intent to deceive, it is not necessary that they show that a defendant made the challenged statement with actual knowledge of its falsity.  They may also establish intent to deceive by showing that the defendant made the statement "recklessly without knowledge or disregard of either truth or falsity" or "under circumstances which indicate that the speaker should have known it was false, irrespective of whether or not he actually knew it was false."  Felts v. National Account

Systems Ass'n, Inc., 469 F. Supp. 54, 67 (N.D. Miss. 1978) (citing

H. D. Sojourner & Co. v. Joseph, 186 Miss. 755, 191 So. 418

(1939)).

A claim of negligent misrepresentation requires proof, by a

preponderance of the evidence, of the following:

> (1) a misrepresentation or omission of a fact; (2) that
> the representation or omission is material or
> significant; (3) that the defendant failed to exercise
> that degree of diligence and expertise the public is
> entitled to expect of it; (4) that the plaintiff
> reasonably relied on the defendant's representations;
> and (5) that the plaintiff suffered damages as a direct
> and proximate result of his reasonable reliance.

Moran, 919 So. 2d at 973 (quoting Skrmetta v. Bayview Yacht Club,

Inc., 806 So. 2d 1120 (Miss. 2002)).

Conspiracy requires a finding of "(1) two or more persons or

corporations; (2) an object to be accomplished; (3) a meeting of

the minds on the object or course of action; (4) one or more

unlawful overt acts; and (5) damages as the proximate result."

Gallegos v. Mid-South Mortg. & Inv., Inc., 956 So. 2d 1055, 1060

(Miss. Ct. App. 2007) (citing Gallagher Bassett Servs. v.

Jeffcoat, 887 So. 2d 777, 786 (Miss. 2004)). "It is imperative

that a plaintiff asserting a cause of action for conspiracy prove

that the parties had an agreement, either to accomplish an

unlawful purpose or to accomplish a lawful purpose unlawfully."

Id. In the court's opinion, under any applicable standard,

plaintiffs have failed to prove either that the figures reported

on the Trailing 12s were inaccurate or, if inaccurate, that any of

the defendants knew or had reason to know they were inaccurate or recklessly represented them as accurate without knowledge as to whether or not they were, in fact, accurate.

As support for their allegation that the information in the Trailing 12s was inaccurate, plaintiffs first note that the figures shown on the Trailing 12s are inconsistent with Schedule E to the Wallaces' 2005 tax return, which shows the income generated by the rental business for 2005 was $275,726, an amount significantly less than the $667,786 reflected on the Combined Trailing 12. On the record before it, the court would hesitate to conclude as a matter of law that, in fact, the rental income figures in the Trailing 12s provided the Marshes were entirely accurate. However, the court readily concludes that plaintiffs have not proven them to be false by a preponderance of the evidence, and certainly not by clear and convincing evidence. See United States v. Barksdale-Contreras, 972 F.2d 111, 115 (5th Cir. 1992) " A preponderance of the evidence means only that it is more likely than not that a fact is true."); Shafer v. Army & Air Force Exchange Serv., 376 F.3d 386, 396 (5th Cir. 2004) ("Clear and convincing evidence is that weight of proof which produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the

truth of the precise facts of the case.") (citations and internal quotations omitted).

The combined Trailing 12 provided to the Marshes in April 2006 covering the period March 2005 through February 2006 reflects combined net rental income of $667,686, which plaintiffs point out is significantly more than the $275,726 shown as net rental income on the Wallaces' initial 2005 income tax return. Plaintiffs submit that the lower net rental income figure reported in the tax return is compelling evidence that the net rental income represented in the Trailing 12s was grossly inflated. Plaintiffs acknowledge that the Wallaces subsequently filed an amended 2005 tax return in which the net rental income figure was increased to $772,441, ostensibly because the Wallaces' accountant, Marcie Ainsworth, realized after the original 2005 return was filed that she had erroneously included only partial rental income information. Plaintiffs submit, however, that Ainsworth's explanations of both the reason for her filing the amended return and of the basis for the income figures she reported in the amended return are not credible, and they insist that, in fact, as their expert Ken Lefoldt explained, the only income figures that are supported by any records maintained by Wallace or the management companies are those in the original 2005 tax return.

Certainly it cannot be said that Ainsworth's explanations of the alleged need for an amended tax return and of the figures

therein are unassailable.  Yet her explanations, while not

compelling, are plausible, and in the court's view, it is no more

likely that the figures in the original tax return were correct

than it is that the figures in either the Trailing 12s or amended

return were correct.  What seems most likely to the court is that

at this point, no one really knows precisely, or perhaps even

roughly, how much rental income was generated by the properties

during the relevant time period – which is to say, the court is

not persuaded that on the basis of the 2005 tax return,

plaintiffs have shown that the figures in the Trailing 12s were

not accurate, or at least reasonably accurate.

Plaintiffs also argue that the Trailing 12 income figures

are inconsistent with a revelation by Wallace and O'Dom in

November 2006, months after closing, that when he owned the

business, Wallace had needed to sell homes in order to keep the

business "afloat".  Plaintiffs argue that this information was

inconsistent with the Trailing 12s, which showed a net operating

profit even without the sale of properties.  However, contrary to

the plaintiffs' urging, the notion that the sale of properties was

necessary for profitability, i.e., to keep the business afloat, is

not necessarily inconsistent with the Trailing 12s.[1]  As the

---

[1]     Notably, the Marshes do not specifically allege herein
that Wallace misrepresented the profitability of the business;
rather, they allege that he misrepresented the rental income of
the business, on which they relied in making their own
determination of profitability based on their own anticipated
expenses/expenditures (including what they expected would be their

Marshes were aware, the Trailing 12s were prepared for the purpose of securing financing, not for the purpose of selling the properties; and the Trailing 12s did not purport to provide comprehensive financial information on the properties. There was no information on Wallace's cost of debt service on the properties (and the Marshes admit they did not know and never actually learned this information), nor was there information on capital expenditures (of which they admittedly were also unaware), all of which would undeniably bear on the profitability of the business. In short, the Marshes could not have assessed profitability solely on the basis of the Trailing 12s because these documents did not include all the information needed to make that assessment; and, the Trailing 12s are not inconsistent with Wallace's assertion that in his experience, the sale of properties was necessary for the business to be profitable.[2]

---

own cost of debt service).

[2]    Plaintiffs have also charged that Wallace and O'Dom concealed from them the fact that the business was not profitable without the sale of homes. The Marshes have maintained that while there were pre-closing discussions with Wallace and O'Dom about the sale of homes, these discussions were about enhancing the rental income by adding more rental units, and they insist they were never interested in selling properties as part of their business plan. They state that had they known they would have to sell properties to keep the business "afloat", they would never have purchased the properties. However, Bubber Wallace, O'Dom and Ainsworth credibly testified to discussions with the Marshes concerning the fact that the purchase and sale of non-rental properties was an integral part of Wallace's business model. Even if it were debatable whether the Marshes should necessarily have understood from these discussions that such sales were essential for profitability, it would be difficult to find that this

The Marshes further argue that the fact that Wallace had a number of long overdue debts which he said he had not paid because he "didn't have the money to pay [them]" and about which he explained that the proceeds from the sale to the Marshes was his "first available source of money" to pay the debts, is contrary to the representation of Wallace's net operating profit in the Trailing 12s. Again, however, the court observes that the Trailing 12s do not comprehensively cover "profitability," and in any event, the fact that Wallace had failed to pay outstanding debts is hardly persuasive, much less compelling evidence, that his businesses were not profitable. Indeed, such evidence is practically meaningless on the issue.

The Marshes finally urge that their own experience with the properties strongly suggests that the rental income in the Trailing 12s was overstated. In particular, the Marshes submit that the fact that the rental income they collected was significantly less than the income reported on the Trailing 12s for the same period demonstrates that the Trailing 12s were inaccurate. In the court's opinion, however, little of relevance on this issue can be gleaned from the Marshes' experience with the properties. The Marshes relied completely on Eva Green to run the business, with no meaningful oversight of any kind; and Eva Green

information was concealed from them, unless the Trailing 12s clearly demonstrated profitability without sales. In the court's opinion, they did not.

obviously took advantage of the situation, and of the Marshes. It is reasonably clear from the evidence adduced at trial that Green's activities went well beyond gross mismanagement. In the first month, she claimed to the Marshes that an employee had stolen $12,000 from the business in a four- to six-week period, which the Marshes reimbursed from personal funds. Expenses jumped by nearly four hundred percent. And, while one could debate the extent of her malfeasance in this respect, there is little or no doubt from the evidence that she routinely used monies from the business – accumulating to thousands of dollars – for personal use. Confronted with irrefutable evidence of Green's misconduct and obvious abuse of her position, the Marshes simply contend that Green's activities have nothing to do with the issue herein, which is whether rental income was overstated in the LLCs. They maintain that since the evidence adduced by defendants relates to *expenditures* by Green and does not show that Green failed to accurately account for all *rental income*, then their experience with rental income provides a valid basis for comparison, and tends to show that the rental income in the Trailing 12s was false. In the court's opinion, however, it cannot reasonably be concluded that the Trailng 12s are inaccurate based solely on rental income figures reported by Green. Given the known circumstances relating to Green's mismanagement of the business,

it would folly to rely on Green's reports of income as a valid basis for finding the figures in the Trailing 12s were incorrect.[3]

The Marshes have offered no other basis on which to conclude that the Trailing 12s were inaccurate, and in the court's opinion, they have failed to sustain their burden to prove that the figures therein were false. The court would further observe, though, that even if it were persuaded (and it is by no means even arguably convinced) that the figures were wrong, plaintiffs have completely failed to prove that any of the defendants knew or had reason to know the figures were false, or otherwise acted recklessly in representing the figures as accurate.

Initially, the Marshes received a set of Trailing 12s on the Wallace LLCs as part of the Lincoln Capital loan package in February 2006. That loan package was prepared by Lincoln Capital based on information obtained from Affordable Properties, the management company in place for the LLCs in 2005. Evidence was presented that for the period through August 2005, Missy Wallace obtained the rental income documents from the management company for the properties and delivered it to Rea, Shaw, Giffin & Stuart, the Wallaces' accounting firm, which in turn input the information on a spreadsheet provided by Lincoln Capital and forwarded the spreadsheet to Lincoln Capital. For the period from and after

---

[3]   But even if collections were lower, even if significantly lower, that would not necessarily persuade the court that the Trailing 12s were inaccurate.

August 2005, Michael Williams, who had become the property manager for the Wallaces, provided financial information on the properties directly to Lincoln Capital, which for its loan package to shop to prospective lenders, prepared the Trailing 12s based on the information with which it had been provided.  The loan package, including the Trailing 12s, was, in turn, furnished to the Marshes when they requested financial information from Bubber Wallace. Subsequently, in April, Wallace provided updated Trailing 12s for the LLCs, covering the months of January and February 2006, and a combined Trailing 12 on all the LLCs, in connection with which he submitted Statements of Business Equities, attesting that the information provided was true and accurate to the best of his knowledge.

Plaintiffs have offered no evidence that Missy Wallace had any role in the preparation of the Trailing 12s, other than to deliver documents from the management company to the accountant, or that she was involved in providing the Marshes with the Trailing 12s or any other financial information.  Nevertheless, plaintiffs argue that Mrs. Wallace is liable for fraud or misrepresentation because she "supported" the information in the Trailing 12s by answering Kirk Marsh's questions about the meaning of some of the categories included in the Trailing 12s.  This position is patently without merit and is rejected.

There is no evidence that Richard O'Dom had any sort of role, even tangential, in the preparation of the Trailing 12s (unless one counts his having engaged Lincoln Capital to assist Wallace in securing refinancing of his loans on the properties). The evidence, in fact, is to the contrary. He did direct that a copy of the Lincoln Capital loan package which included the Trailing 12s be provided to the Marshes; but there is nothing in the record to suggest that O'Dom knew or had reason to know that any of the information therein was incorrect. In fact, Russel Marsh admitted that he believed at the time that O'Dom himself believed the figures were accurate and that he has no evidence now to suggest otherwise.

As for Bubber Wallace, although he attested in the Statement of Business Equities that the information included in the financial documents he had provided the Marshes, including the Trailing 12s, was correct to the best of his knowledge, plaintiffs have failed to demonstrate that Wallace, in fact, knew or had reason to know the figures that were provided were inaccurate. As with O'Dom, plaintiffs have no evidence to establish that Wallace did not believe the numbers in the Trailing 12s were accurate. Mr. Wallace was himself not involved in the daily operation of the businesses and instead relied on information that had been reported by the managers he hired to manage his rental properties, as well as on his accountant, who in turn forwarded to Lincoln

Capital the rental income information that had been reported to her.  The only evidence the Marshes have identified as suggesting that Mr. Wallace knew or should have known that the Trailing 12 figures were inaccurate, is an alleged post-sale comment by Bubber Wallace that he could only remember one month in which his collections on the properties had reached $55,000.  The Marshes note that the combined Trailing 12 reflects rental income in excess of $55,000 in six months, and they maintain, based on Wallace's comment, that Wallace must have known that the Trailing 12 figures were inflated.  Yet, Kirk Marsh testified at trial that it was his impression from early on that Bubber Wallace was not knowledgeable about the properties, and thus, just as he would not have relied (and could not reasonably have relied) on Wallace's comment as establishing the truth of the businesses' rental income, this court does not accept Wallace's alleged comment as probative on the businesses' rental income.

In addition to their claim that defendants made affirmative misrepresentations, plaintiffs have argued that these defendants committed fraud by concealment, in that they concealed from plaintiffs (as they phrase it) "the fact that vital data on which the representations (in the Trailing 12s) were purportedly based – and which could determine their truth or falsity – were unavailable because Michael Williams had absconded with them." Fraud by concealment occurs when a party fails to disclose a

material fact which the party has a legal duty to disclose.
Outside the context of a fiduciary duty, which is the principal
setting in which there arises a duty of disclosure, <u>see</u> <u>Taylor v.</u>
<u>Southern Farm Bureau Cas. Co.</u>, 954 So. 2d 1045, 1049 (Miss. 2007),
"[t]he duty to disclose is based upon a theory of fraud that
recognizes that the failure of a party to a business transaction
to speak may amount to the suppression of a material fact which
should have been disclosed and is, in effect, fraud," <u>Holman v.</u>
<u>Howard Wilson Chrysler Jeep, Inc.</u>, 972 So. 2d 564, 568-569 (Miss.
2008) (citing <u>Welsh v. Mounger</u>, 883 So. 2d 46, 49 (Miss. 2004).
In <u>Holman</u>, the court, citing the <u>Restatement (Second) of Torts</u>,
described those limited circumstances in which a duty to disclose
may arise:

> (2) One party to a business transaction is under a duty
> to exercise reasonable care to disclose to the other
> before the transaction is consummated ...
>> (b) matters known to him that he knows to be
>> necessary to prevent his partial or ambiguous
>> statement of the facts from being misleading;
>> and ...
>> (d) the falsity of a representation not made
>> with the expectation that it would be acted
>> upon, if he subsequently learns that the other
>> is about to act in reliance upon it in a
>> transaction with him; and
>> (e) facts basic to the transaction, if he knows
>> that the other is about to enter into it under a
>> mistake as to them, and that the other, because of
>> the relationship between them, the customs of the
>> trade or other objective circumstances, would
>> reasonably expect a disclosure of those facts.

<u>Id</u>. at 568-569 (quoting <u>Restatement (Second) of Torts</u> § 551
(1977)).  A duty to disclose by a non-fiduciary may also arise

when he originally provided incorrect or incomplete information, which he knows may be misleading.  See Welsh, 883 So. 2d at 49.

There is no merit to this concealment claim.  First, while plaintiffs have argued that Wallace misrepresented that the records supporting the Trailing 12s were "in the office," the Marshes were given unlimited access to all the records that were "in the office".  Kirk Marsh, in fact, undertook to review the records that were maintained "in the office," presumably to verify the information in the Trailing 12s; but when he could not match the financial information on the Trailing 12s to the records he reviewed in the files that were "in the office," he abandoned the effort altogether.  Thus, it can hardly reasonably be suggested that Wallace could somehow be liable for misrepresenting that records to verify the Trailing 12s were "in the office" with the intent that the Marshes rely on this alleged representation. Moreover, the related claim for misrepresentation based on Wallace's and O'Dom's having "concealed" the fact that Michael Williams had absconded with many records of the business fails for at least two reasons.  First, they had no duty to disclose this fact; and second, the Marshes were given access to all the records that were in the office and could have determined for themselves if there were records in the office that would support the information set forth in the Trailing 12s.[4]

---

[4]Plaintiffs also point to alleged statements by Wallace that his rental business was "profitable" and a statement by O'Dom to

Based on the foregoing, the court concludes that plaintiffs have failed to sustain their burden to prove either fraud or negligent misrepresentation by the Wallaces or by O'Dom. It follows that plaintiffs cannot establish any alleged conspiracy to defraud.

In addition to their misrepresentation claims, plaintiffs have asserted a claim against O'Dom for violation of Mississippi Code Annotated § 73-35-1, which proscribes acting in the capacity of a real estate broker without a real estate broker's license. This statute states:

> [I]t shall be unlawful for any person, partnership, association or corporation to engage in or carry on, directly or indirectly, or to advertise or to hold himself, itself or themselves out as engaging in or carrying on the business, or act in the capacity of, a real estate broker, or a real estate salesperson, within this state, without first obtaining a license as a real estate broker or real estate salesperson as provided for in this chapter.

---

Russel Marsh that this was a "good deal" as additional bases for their misrepresentation claims. To the extent Wallace may have made such comments, they would appear to be too vague and unspecific to constitute statements of "fact" as needed to support a claim for misrepresentation; but in any event, it appears that *for Wallace*, the business was profitable, even if only marginally so. The alleged statement by O'Dom that this was a "good deal" is not a statement of fact, but rather of opinion, or mere "puffery," and hence is not actionable. See Thomas v. Mississippi Val. Gas Co., 237 Miss. 100, 110, 113 So. 2d 535, 538 (Miss. 1959) (holding that "mere general commendations of property sought to be sold, commonly known as 'trade talk,' 'dealer's talk,' 'seller's statement,' or 'puffing,' do not amount to actionable misrepresentations where the parties deal at arm's length and have equal means of information and are equally qualified to judge of the value of the property sold. To such statements the maxim of 'caveat emptor' applies.") (citations omitted).

Miss. Code Ann. § 73-35-1. Mississippi Code Annotated § 75-35-3

defines the term "real estate broker" to include:

> all persons, partnerships, associations and
> corporations, foreign and domestic, who for a fee,
> commission or other valuable consideration, or who with
> the intention or expectation of receiving or collecting
> the same, list, sell, purchase, exchange, rent, lease,
> manage or auction any real estate, or the improvements
> thereon, including options; or who negotiate or attempt
> to negotiate any such activity; or who advertise or hold
> themselves out as engaged in such activities; or who
> direct or assist in the procuring of a purchaser or
> prospect calculated or intended to result in a real
> estate transaction.

Finally, as is pertinent here, Mississippi Code Annotated

§ 73-35-31(2) provides that any person who has

> received any sum of money, or the equivalent thereto, as
> commission, compensation or profit by or in consequence
> of his violation of any provision of this chapter ...
> shall ... be liable to a penalty of not less than the
> amount of the sum of money so received and not more than
> four (4) times the sum so received, as may be determined
> by the court, which penalty may be sued for and
> recovered by any person aggrieved and for his use and
> benefit, in any court of competent jurisdiction.

The parties vigorously dispute whether O'Dom's role in the

transaction at issue was as a real estate broker, as that term is

defined in § 75-35-3.  O'Dom (as well as Wallace) insists that he

acted in the capacity of a financial advisor to Mr. Wallace, for

which he was compensated by Mr. Wallace.  And he maintains that at

no time during the transaction did the Marshes consider that his

role was that of a real estate broker.  Russel Marsh plainly

testified that the property was listed, not by O'Dom, but by Phil

Coggins.  Further, the contract for purchase, including both the

29

initial draft that was prepared by William Ready and the final draft prepared by William Ready in consultation with Kirk Marsh, explicitly recited that both parties "represent[ed] and [warrant[ed] to the other that it has not used any broker, agent, finder or other person in connection with the transaction contemplated hereby to whom a broker commission or other fee may be payable."  Further, on the HUD-1s for the June "dry" closing and for the July "wet" closing, the line for "settlement charges, total sales, brokers' commission based on price, $4.9 million at," is left blank, indicating that no party considered that any broker's commission or fee was being paid.  They note, too, that even after the transaction had closed, Mr. O'Dom continued to be involved.  On occasions post-closing when Mr. Wallace met with one of the Marshes, Mr. O'Odom was present, and he continued working with Russel Marsh to help the Marshes obtain refinancing for the properties to replace their existing loans, including their debt to Bubber Wallace.  O'Dom reasonably argues that these are not the actions of one who would fairly be considered a real estate broker.  O'Dom finally points out that when the Marshes initially filed suit, they did not identify him as a real estate broker, but rather as "Mr. Wallace's financial advisor and a former bank officer."  Only after they had gotten their legal expert, Ken Boackle, involved in the case did they decide to pursue a claim against him for acting as a real estate broker without a license.

Finally, O'Dom maintains that while the list of Wallace's existing debts that was included with the HUD-1 settlement statements at both closings reflected $150,000 was to be paid to him, this payment was not for any services by him as a real estate broker but rather was for his financial services to Wallace.[5]

The Marshes, in contrast, argue that O'Dom's actions in, and behavior during, the transaction between them and Wallace are identical to acts identified in § 75-35-3 as those of a real estate broker. They contend that O'Dom's role in the transaction was more than as a mere financial advisor; rather, it was to assist Wallace in negotiating with Wallace for the purchase of Wallace's rental business, and that O'Dom's focus throughout was clearly on putting the deal together and getting the Marshes to the closing table. They note that in correspondence with the Marshes, Wallace himself referred to O'Dom as a "no nonsense deal maker," and expressed his hope and desire that the Marshes would "feel compelled to allow [O'Dom] to handle the transaction all the way to the closing table." Wallace directed that the Marshes channel any requests through O'Dom, so that "we may stay focused and organized and provide you with accurate documentation that will undoubtedly lead to a mutually beneficial closing."

---

[5]  He also contends that, in fact, only $50,000 of that amount was actually for work performed in connection with the subject transaction; the remaining $100,000 was for his work as a financial advisor to Wallace on another, separate transaction for which he had not yet been paid.

Moreover, although O'Dom lived in Texas, he was present every time the Marshes were in Mississippi. He dined with them; took them on a driving tour of the properties; introduced them to Mr. Ready, to Mr. Howell, to Ms. Ainsworth, to local bankers and to city officials; and directed the flow of information and documents. Plaintiffs further claim that O'Dom was in constant contact with them throughout the transaction, discussing the properties and how to structure the transaction. They claim, too, that during the negotiations, he managed the property for Wallace, monitoring and handling the collection of rents, and interacting with (or dealing with) Eva Green on Wallace's behalf. And, notwithstanding that the contract for purchase recited that neither party had used a broker, agent or other person in connection with the transaction to whom a broker commission or fee may be payable, and further notwithstanding that the HUD-1s left blank the space provided for any broker's fee, the Marshes contend that O'Dom was paid a broker's fee of $150,000 – or at the very least, of $50,000 – for his role in the transaction.

The court does accept that O'Dom acted as a financial advisor to Mr. Wallace, and that the compensation he received in connection with this transaction covered his services as financial advisor. It is also apparent to the court that, at last during the transaction and on into the litigation, the Marshes accepted without question this characterization of O'Dom, and probably did

not consider him to conform to their lay understanding of the concept of "real estate broker." However, even though O'dom acted as a financial advisor, and even though the Marshes accepted this was his role, his services were not necessarily limited to financial advice/consultation. Having considered the evidence, it is arguable that some of the activities in which O'Dom engaged are of the type identified in § 75-35-3 as the acts of a real estate broker. True, O'Dom did not "list, sell, purchase, exchange, rent, lease, manage or auction any real estate, or the improvements thereon."[6] Arguably, however, he assisted Wallace in procuring a purchaser for the properties, just as, arguably, he attempted to negotiate a purchase of the properties (not the purchase price, but rather terms and the manner of purchase, e.g., financing). Cf. Ladner v. Harsh, 239 Miss. 46, 120 So. 2d 562 (Miss. 1961) (finding the defendant acted as real estate broker where he guided the negotiations between purchaser and seller, induced a purchaser to visit the seller's properties, drove the purchaser to see the properties, attended the signing of the contract for sale and attended the closing). It is unclear whether O'Dom was compensated for these services (above and beyond what he would have been paid merely for his financial advice).[7]

---

[6] The court acknowledges plaintiffs' argument that O'Dom "managed" the property; but in the court's opinion, the evidence does not support this characterization of his actions.

[7] If O'Dom, who was clearly one of Bubber Wallace's closest long-time friends, had undertaken gratis any of the kinds

But, even if he were, in the court's opinion, plaintiffs have no viable claim against him for violation of § 73-35-31, since plaintiffs were not "aggrieved by" his alleged violation.

The parties have stipulated that whatever fee O'Dom received for his services in the transaction was paid by Bubber Wallace from the "up front" funds he received in the transaction to pay his debts, and it is stipulated that the payment did not affect the purchase price paid by the Marshes. The question, then, is whether the Marshes, having not paid his commission or fee, could have been "aggrieved by" O'Dom's alleged violation of the statute (performing services as a broker without a license), and if so, whether and how they were aggrieved. Citing <u>Saucier v. Coldwell Banker Joseph M. Endry Realty</u>, 291 Fed. Appx. 674, 2008 WL 4155312 (5th Cir. 2008), O'Dom takes the position that, as a matter of law, only one who pays the broker's fee can be an "aggrieved person" under the statute. In <u>Saucier</u>, a Mississippi-licensed realtor sued realtors who had sold condominium properties which she might otherwise have sold, arguing that she was an "aggrieved person" under the subject statute because they had "illegally usurped commissions to which she would have been entitled under

---

of activities included in the statutory definition of a real estate broker, he would not have violated § 73-35-31. Under the statute, one is only considered a real estate broker to the extent he is paid, or engages in the identified activities, with the expectation of compensation. Here, O'Dom was paid for doing something; it is just not clear for precisely what services he was paid.

Mississippi law." 291 Fed. Appx. at 676, 2008 WL at 1. The Fifth
Circuit, citing <u>Leary v. Stockman</u>, 937 So. 2d 964, 974 (Miss. Ct.
App. 2006), on which the district court had relied, found that the
district court had correctly concluded that Saucier was not a
"person aggrieved" under § 73-35-31(2) and therefore lacked
standing. <u>Id.</u> The district court had read <u>Leary</u> as establishing
that under Mississippi law, "only the buyer or seller paying a
commission to [a] foreign broker qualified as a "person
aggrieved." <u>Saucier v. Coldwell Banker JME Realty</u>, No. Civ.
Action No. 1:04CV686HSORHW, 2007 WL 2475943, 5 (S.D. Miss. Aug.
28, 2007). In <u>Leary</u>, as in <u>Saucier</u>, the plaintiff was a realtor
who claimed to have been deprived of real estate commissions on a
sale of condominiums in Mississippi by the actions of a foreign
broker who was not licensed in Mississippi. The court in <u>Leary</u>
considered the statute ambiguous as to the meaning of "person
aggrieved," and "interpret[ed] the statute to apply to situations
in which a foreign broker or agent receives a commission from
either the buyer or the seller; so that the foreign broker or
agent is penalized for his unlicensed transaction." <u>Id.</u> at 974.
The local broker did not qualify as a "person aggrieved" under
this interpretation.

In contrast to this case, where the plaintiff is a party to
the real estate transaction, the plaintiffs in both <u>Saucier</u> and
<u>Leary</u> were real estate brokers who claimed to have been deprived

of commissions they might otherwise have received by the actions of unlicensed brokers in brokering Mississippi real estate transactions without a Mississippi license and without cooperating with a Mississippi broker.  However, given that plaintiffs herein did not pay any part of the commission or fee which Mr. O'Dom received, which was instead paid entirely by Bubber Wallace, it is difficult to fathom how they could possibly have been aggrieved by O'Dom's alleged violation of the statute.  When asked at trial what damages he suffered, or how he was aggrieved as a result of O'Dom's having acted as a broker without a license, Russel Marsh responded,

> [T]he damages for me would be that would have come as a result of Mr. O'Dom's actions would be the expectation that the information that he was providing me was true and accurate and that subsequent discussions were that those numbers that were given to me were not accurate. And if I had known that the numbers were different and significantly less than what was given to me, I would not have done the transaction. ... So I guess the damage would be because it was represented the way it was, I went through with a transaction that in other – that I guess I otherwise would not have done.

However, the court has already concluded that plaintiffs have failed to establish there was any misrepresentation by O'Dom. Accordingly, even assuming the Marshes were not foreclosed from qualifying as "aggrieved persons" since they did not themselves pay O'Dom's alleged broker's commission, they cannot prevail under the statute because they cannot establish that they were, in fact,

aggrieved, by O'Dom's violation of the statute.  Plaintiffs'
complaint against O'Dom will be dismissed with prejudice.

Plaintiffs have advanced claims for legal malpractice against
attorney John Howell, both for breach of fiduciary duty and for
negligence.  As the Mississippi Supreme Court has explained, legal
malpractice covers any professional misconduct by an attorney,
whether attributable to negligence, i.e., breach of the standard
of care, or to breach of the fiduciary obligations, i.e., breach
of the standard of conduct.  Lane v. Oustalet, 873 So. 2d 92,
98-99 (Miss. 2004) (citing Hartford Acc. & Indem. Co. v. Foster,
528 So. 2d 255, 285 (Miss. 1988)).  In other words, "legal
malpractice may be a violation of the standard of care of
exercising the knowledge, skill, and ability ordinarily possessed
and exercised by members of the legal profession similarly
situated, or the breach of a fiduciary duty."  Id. (citing
Foster).

> To recover under the negligence theory of legal
> malpractice, the client must prove the existence of an
> attorney-client relationship, the acts constituting
> negligence, that the negligence proximately caused the
> injury, and the fact and extent of the injury. ...  The
> elements of [the] cause of action [for breach of the
> standard of conduct] are the same as other legal
> malpractice actions except, instead of proving
> negligence, the plaintiff must prove a violation of the
> attorney's fiduciary duty.

Id. (citations omitted).

The Marshes have alleged that Howell breached his fiduciary
duty of loyalty to them by undertaking to represent them in their

transaction with Bubber Wallace while burdened with conflicts of interest arising from the fact that he had a personal interest in recovering $36,000 in overdue legal fees which he hoped to recover out of the proceeds of the Marsh/Wallace closing, and also because, as to the subject transaction, in addition to representing the Marshes, he was representing his long-time client, Wallace, whose interests were adverse to the Marshes'.

Addressing a lawyer's duties to his client, the Mississippi Supreme Court has recognized that, in addition to a duty of care, "'[e]ach lawyer owes each client a ... duty, not wholly separable from the duty of care but sufficiently distinct that we afford it its own label, viz. the duty of loyalty, or, sometimes, fidelity. We speak here of the fiduciary nature of the lawyer's duties to his client, of confidentiality and of candor and disclosure.'" Waggoner v. Williamson, 8 So. 3d 147, 154 (Miss. 2009) (quoting Singleton v. Stegall, 580 So. 2d 1242, 1244-45 (Miss. 1991)); id. (also recognizing that a lawyer may be sued for his violation of this duty). This duty of loyalty includes "a duty to inform his client of all matters of reasonable importance related to the representation or arising therefrom," including that he must in all cases inform the client of any conflict of interest. Id. A conflict of interest arises where "there is a substantial risk that the lawyer's representation of the client would be materially and adversely affected by the lawyer's own interests or by the

38

lawyer's duties to another current client, a former client, or a

third person."  Restatement (Third) of the Law Governing Lawyers

§ 121.  See also Waggoner, 8 So. 3d at 154 (observing that one

form of breach of fiduciary duty can occur in situations in which

the attorney or other clients have interests adverse to the client

in question) (citing Tyson v. Moore, 613 So. 2d 817, 827 (Miss.

1992)).  In such situations, the lawyer's duty of loyalty includes

a duty to "avoid conflicting interests that might impair the

representation...."  Id. (citing Tyson).[8]

---

[8]     On the subject of conflicts of interest, Rule 1.7 of the
Code of Professional Responsibility of the Mississippi State Bar,
states:
> (a) A lawyer shall not represent a client if the
> representation of that client will be directly adverse
> to another client, unless the lawyer reasonably
> believes:
> (1) the representation will not adversely affect the
> relationship with the other client; and
> (2) each client has given knowing and informed consent
> after consultation.  The consultation shall include
> explanation of the implications of the adverse
> representation and the advantages and risks involved.
> (b) A lawyer shall not represent a client if the
> representation of that client may be materially limited
> by the lawyer's responsibilities to another client or to
> a third person, or by the lawyer's own interests, unless
> the lawyer reasonably believes:
> (1) the representation will not be adversely affected;
> and
> (2) the client has given knowing and informed consent
> after consultation.  The consultation shall include
> explanation of the implications of the representation
> and the advantages and risks involved.

The Rules of Professional Conduct do not provide a basis for civil
liability but rather are intended for a lawyer's self-governance
and disciplinary purposes.  They can, however, provide guidance as
to a lawyer's standard of conduct.  See Singleton v. Stegall, 580
So. 2d 1242, 1244 n.4 (Miss. 1991)).

It is undisputed that at the time of the subject transaction, Bubber Wallace owed Howell $36,000 in attorney's fees, most of which ($28,000) was for title work Howell had previously done on Wallace's properties (in connection with the Rossini deal that never closed) and some of which was, as described by Howell, "just an accumulation of fees owed from [his] representing Wallace in the past." After the Marshes signed a contract in May 2006 to purchase Wallace's rental properties, Wallace suggested to the Marshes that they get Howell to do the title work since he had previously done title work on the properties and could give them a good price for doing the work.[9] At Wallace's suggestion, Russel Marsh met with John Howell in early June, and agreed to have Howell do the title work. After Russel and Wallace agreed that the Marshes should purchase the LLCs rather than buying the properties directly, this was communicated to Howell, likely by Wallace. Subsequently, Kirk Marsh contacted Howell about closing the purchase of the LLCs, and toward that end, drafting agreements transferring ownership of the LLCs to Marsh Investment Group. Howell drafted transfer agreements based on a form he acquired from William Ready, and he then forwarded the draft agreements to Kirk Marsh. The two worked together toward finalizing the

---

[9] The Marshes dispute that Wallace told them Howell had previously done title work on Wallace's rental properties. The court finds the he did tell them this.

transfer agreements, which were executed by Wallace and the
Marshes at the dry closing in June.  In addition to the transfer
agreements, Howell also prepared for the June closing a HUD-1
statement, which listed Wallace's $36,000 debt to Howell among the
debts Wallace would pay from funds he would receive from the
Marshes.  Howell also prepared a promissory note from the Marshes
to Wallace, along with promissory notes in favor of Missy Wallace,
Nell Wallace and Harold Wright.

Following the June closing, Howell prepared additional
documents, including a revised HUD-1, which, again, reflected
Wallace's $36,000 debt to him; a continuing guaranty agreement for
the Marshes to sign, which Wallace had required of them;
certificates of title for Commercial Bank; and a general pledge
agreement by which the Marshes agreed to assume Wallace's existing
debts on the properties.

Owing to the fact of his prior representation of Wallace and
the fact that he was owed $36,000 in legal fees by Wallace,
plaintiffs charge that Howell had a conflict of interest based on
his personal financial interest in Wallace's transaction with them
is hardly controversial.  Indeed, Howell acknowledges that in
light of these circumstances, the best course of action would have
been for him to have obtained a written consent and waiver from
Russel Marsh at their first meeting in early June.  However, he
points out that no statute or law required such written consent or

waiver.  And, he insists both that he reasonably believed that these circumstances would not adversely affect his representation of any party in the transaction and that he did expressly inform Russel both of his prior representation of Wallace and of the existing debt owed to him by Wallace.  Howell maintains that Russel, fully aware of these facts, consented, initially, to Howell's doing the title work on the properties, and then, to Howell's handling the closing, even after the transaction changed from a direct purchase of the properties to the Marshes' purchase of Wallace's LLCs.  In short, he contends the Marshes were aware of his potential conflict of interest and consented to his handling the transaction.  The Marshes, on the other hand, contend they were unaware of Wallace's indebtedness to Howell for prior legal work, and that since this was never disclosed to them, they never had the opportunity to decide whether to consent to Howell's representation; and they contend that, had they known this fact, they probably would not have agreed to Howell's involvement in the transaction.

While Howell's personal financial interest in the transaction indisputably created a conflict of interest, the court finds that, contrary to the Marshes' urging, his interest was disclosed and that the Marshes knew of Howell's interest from the outset.  In his testimony at trial, Russel Marsh could not recall precisely what Howell told him in their initial meeting in early June.  He

did recall having been told at some point that Howell had previously done title work; but he did not recall Howell's saying that he had previously done title work for Wallace's rental properties. Moreover, Russel did not recall Howell telling him he was owed $36,000 for legal work Howell had previously done for Wallace. Howell, on the other hand, was clear in his recollection that he specifically and clearly informed Russel that he had previously done legal work for Wallace, including title searches on his rental properties, and that Wallace owed him $36,000 in legal fees for this past work. In fact, Howell produced contemporaneous notes of his meeting with Russel which reflect that he informed Russel of these matters. Thus, when they were provided at the June closing (and later at the July closing) with the list of Wallace's debts, neither Marsh questioned or objected to the inclusion of a $36,000 debt to Howell because they had already been made aware of it.

Having considered the evidence, the court finds that Russel Marsh was apprised of Howell's prior representation of Wallace and of Wallace's debt to Howell. Plaintiffs suggest that even if these matters were made known to Russel, Howell failed to prove the Marshes with enough information to support a conclusion that they gave their informed consent to his conflict of interest. That is, they contend that Howell's disclosure was not sufficient to adequately convey his conflict of interest, noting that the

attorney may not just leave it to the client "to infer the full nature of a conflict from only bits and pieces of actual or constructive knowledge," but instead he must make a full disclosure and explanation of his conflict.  See CenTra, Inc. v. Estrin, 538 F.3d 402, 415 (6th Cir. 2008); Foster, 528 So. 2d at 268.  They contend further that plaintiffs' failure to object to Howell's representation does not establish consent.  See Centra, 538 F.3d at 416-17 (attorney may not assume consent from client's silent acquiescence).  In the court's opinion, however, although Howell may not have spelled out for the Marshes (as he should have) that his personal interest in receiving payment of $36,000 in past due legal fees from Wallace created a "conflict of interest," the Marshes knew the salient facts and understood, or certainly should have understood the implications; and with such knowledge and understanding, the Marshes agreed to Howell's handling (or involvement in) the transaction.  Accordingly, the court rejects plaintiff's breach of fiduciary duty charge premised on Howell's conflict of interest arising from his personal financial interest in the transaction.

Plaintiffs also contend that Howell had a conflict of interest in the subject transaction arising from his dual representation of the Marshes, as buyers, and Wallace, as the seller/lender, whom he had regularly represented for a number of years, including in matters directly related to Wallace's rental

44

business.  From the court's perspective, it seems that Howell's role in the transaction was never well-defined, particularly as the transaction evolved, and as a consequence is now subject to conflicting assertions by the parties.

At the time Howell first became involved, the transaction, as negotiated and agreed between Wallace and the Marshes, was one in which the Marshes would directly purchase Wallace's rental properties.  The Marshes had signed a contract for the purchases a month before Howell became involved, and they had already paid their $50,000 in earnest money.  The Marshes did not hire an attorney – Howell or anyone else – to assist them in negotiating their agreement with Wallace or to draft the contract for purchase; rather, they had signed a contract that was prepared by Wallace's attorney, William Ready, which agreement included a $4.9 million purchase price and identified the properties being purchased.  That contract gave them a thirty-day contingency period in which to investigate the transaction and any representations relating thereto, which period expired before Russel Marsh ever met or spoke with John Howell.  Only after entering this agreement did the Marshes, at Wallace's suggestion, engage Howell to do the necessary title work for the transaction. At that point, Wallace had already gone to Howell with the Marsh contract and discussed with him the prospect of Howell's doing the

title work; and by that time, Howell had already suggested to Wallace that he do the closing, as well.

Initially, Russel Marsh met with Howell for around fifteen minutes and hired him to do the title work – or, according to the Marshes, agreed to allow him do the title work – for a discounted fee that Wallace had already negotiated with Howell. At that time, there was no discussion between Russel and Howell of Howell's doing the closing. Later, after the Marshes decided to buy Wallace's LLCs in which the properties were held instead of buying the properties outright, the Marshes contacted Howell and asked him to draft agreements transferring ownership of the LLCs from Wallace to the Marshes, and to do the closing. There was no discussion at that time, or at any other, with the Marshes or with Wallace, of whom Howell was representing in the transaction, and specifically, of whether he was representing the Marshes or both the Marshes and Wallace. He simply proceeded forward, initially drafting the transfer agreements in consultation with Kirk Marsh, continuing with the title work and preparing documents the parties required and/or requested for the closing.

When asked at trial whom he thought he represented in the transaction, Howell asserted that the Marshes were his only clients in the transaction; he did not represent Wallace. Wallace, likewise, maintained that he had no attorney in the transaction (other than Ready, who only prepared the original

contract for sale).  On the other hand, Kirk Marsh testified that

he never thought Howell represented only him and Russel; rather,

he saw Howell as "the closing attorney," who represented everyone

in the transaction.  Mr. Marsh explained that initially he and

Russel had simply agreed with Wallace's suggestion that Howell do

the title work (though he would not say that he and Russel "hired"

Howell).  He explained that when the transaction changed in June,

he and Russel "wanted somebody, a lawyer – or we wanted to make

sure that this thing was done correctly.  So we agreed to use Mr.

Howell to prepare documents for the transfer of the LLCs."  When

asked if Howell, in doing that, was representing Marsh Investment

Group, Mr. Marsh responded,

> A.  I don't know that I would characterize that that way.

> Q.  Who was he doing the work for?

> A.  I treated this as a closing attorney who was responsible for mak
> You are now asking me legally who he was representing.  I don't
> know that. ...  I thought he was a closing attorney.  And that
> means to me that he is responsible to make sure that all the
> documents are correct. ... A closing – my experience is a closing
> attorney works with the various parties – whenever you do a
> closing, prepares a lot of documents that are designed to help
> various parties.  It is not a question of is this closing attorney
> representing one or the other.

When asked by the court whether he was suggesting that Howell was

representing both sides, Mr. Marsh responded, "As much as I could

reasonably expect, Your Honor."

> As courts have often acknowledged, "[r]eal estate closings
> present a particularly thorny dilemma for the bar because a
> closing attorney often undertakes responsibilities to various
> parties to the transaction, in contrast to the typical situation

47

in which each party is zealously represented by counsel." <u>Credit Union Cent. Falls v. Groff</u>, 966 A.2d 1262, 1267 (R.I. 2009). Thus, as plaintiffs note, in the context of a real estate closing, where several parties might reasonably rely on the closing attorney's work, the duty of loyalty requires an attorney to be particularly vigilant in delineating whom the attorney represents.

> The attorney in a real estate closing should have a clear understanding of whom he represents, and should make sure that all parties involved in the transaction understand who is and is not the attorney's client, and give unrepresented parties an opportunity to obtain counsel. Assuming that the attorney represents only one party as he should, and that all other parties are made aware of that representation, there is no conflict with the other parties. If an attorney who closes a real estate transaction is merely a scrivener, he must not render legal counsel or advice during the course of the transaction to any party.

Miss. Bar Ethics Opinion No. 248 (2001).

Again, it is clear from the record there never was any discussion by or between Howell and the Marshes and/or Wallace of or concerning whom Howell was representing. It would seem that Howell's role in the transaction, at least as contemplated at the outset, was intended to be essentially that of a scrivener. Howell became involved in the transaction after the parties had already entered an agreement for the sale/purchase of the properties, and it was anticipated that he would do the title work and prepare documents for the closing in accordance with the terms of the agreement the parties had already entered. When the transaction changed from a direct purchase by the Marshes of the properties to a purchase by the Marshes of the LLCs, Howell's role

48

went beyond that of a mere scrivener,[10] as he was requested by the Marshes to draft transfer agreements, which he did, in consultation with Kirk Marsh.  In relation to that specific work, even though he worked from a form he had obtained from William Ready (which, the court notes, he did at Wallace's suggestion), he provided legal advice to the Marshes.

These questions arise:  If Howell represented only the Marshes, and did not also represent Wallace, did he represent the Marshes faithfully, consistent with his fiduciary duty to them, with a singular purpose of representing only their interests in the transaction, and not also any adverse interest of Wallace?  If Howell represented both the Marshes and Wallace, did this dual representation without disclosure of any potential conflict of interest and obtaining the Marshes' consent to such dual representation, amount to a violation of his fiduciary duty?  In the court's opinion, in either event, Howell breached his duty of loyalty to the Marshes.

Notwithstanding Howell's current assertion that he always considered the Marshes to be his only clients, to the exclusion of

---

[10]    "While in many situations an attorney's representation of both a buyer and seller in a real estate transaction may create a conflict of interest, ... if the parties have already agreed on the basic terms of their  agreement and the attorney acts primarily as a 'scrivener' he may normally represent both parties after obtaining their consent."  Beal v. Mars Larsen Ranch Corp., 99 Idaho 662, 586 P.2d 1378, 1384 (1978) (citing, inter alia, Annot.: Attorney and Client: Conflict of Interest in Real Estate Closing, 68 A.L.R.3d 967).

Wallace, it seems more likely he never had a clear understanding of whom he was representing. What is even more likely, in the court's view, is that, whether or not he viewed himself as doing so, Howell undertook to represent both sides to get the transaction closed;[11] and by doing so without disclosing to the Marshes the manifest potential for conflict of interest and hence without obtaining their informed consent to his representation, he violated his fiduciary duty to them. See <u>Foster</u>, 528 So. 2d at 268 (holding that "even if the lawyer reasonably believes (and from an objective point of view) believes he can faithfully represent dual parties with adverse interests, he must still fully explain all implications of the advantages as well as the risks of his representation to both parties, and assure himself that they both have given knowing and informed consent"). The court does recognize that Kirk Marsh has testified that he understood that Howell was representing both sides, as closing attorneys typically do. It is clear here, though, that many details of the parties' transaction remained unsettled, and perhaps even unknown, even up to the time of closing, creating a tremendous potential for conflict of interest, which was not disclosed to the Marshes. It was Howell's affirmative duty to secure their informed consent, which was not done. Thus, to the extent they may have agreed to

---

[11]    Indeed, whereas Howell testified that the Marshes, not Wallace, were his clients, he argues in his post-trial brief that he "was clearly used as a closing attorney owing an obligation to all parties to correctly and accurately draft all documents...."

his dual representation, the court concludes they did not do so knowingly.

Alternatively, if Howell was the Marshes' attorney in the transaction, he clearly had a duty to represent only their interests. In the court's opinion, he failed to do this, though not necessarily in all the many ways claimed by the Marshes. The fact that he failed in this duty is perhaps best exemplified by his having rushed to throw together the June closing because Wallace said it needed to be done, without critically evaluating that claim. For the July closing, he prepared a continuing guaranty for the Marshes to sign in favor of Wallace because Wallace demanded it, without ever consulting with his supposed clients, the Marshes, concerning the advisability of such a move. Howell has testified that Wallace might have called off the deal if the Marshes had not been willing to sign a continuing guaranty; yet while it may be true that the Marshes did not object to signing a guaranty, and may not have done so upon being fully advised in the premises, it still must be recognized that an attorney whose only interest was their interest would likely have counseled with them about their options at that point. Howell, conflicted as he was, failed to do this.

The Marshes have contended that in light of Howell's representation of them under a conflict of interest, they did not receive the representation for which they paid, and as a matter of

51

equity, should recover the fees they paid Howell for his representation of them, totaling $19,425. The court agrees, and concludes that they should recover this amount from Howell.

In addition to their claim against him for breach of fiduciary duty, the Marshes have sued Howell for negligence in three respects, which the court addresses seriatim. The Marshes charge that Howell was negligent in his preparation of the final title certificate he prepared and provided to Commercial Bank on the properties that were collateral for Commercial Bank's loan to the Marshes in that he incorrectly identified Marsh Investment Group, LLC, as the titleholder when, in fact, Queen City, LLC, was the record titleholder. The facts relating to Howell's preparation of the title certificates on the subject properties are not controverted. The Marshes, as Marsh Investment Group, LLC, applied for a loan from Commercial Bank to finance that part of the purchase price which Wallace required be paid up front (which initially was $850,000 and later became $950,000). Commercial Bank's loan was to be secured by select properties owned by the LLCs that the Marshes were purchasing from Wallace. As part of the Wallace/Marsh transaction, the parties had agreed that the Marshes were going to acquire Queen City, LLC, but not Wallace Rentals, LLC, and they had further agreed that all but one of the rental properties owned by Wallace Rentals would be transferred to Queen City. Thus, on June 30, 2006, Wallace

executed a warranty deed prepared by John Howell which transferred from Wallace Rentals to Queen City all but one of the properties owned by Wallace Rentals.  However, this warranty deed was not to be recorded until after the "wet" closing.  In mid-July, in advance of the "wet closing," Howell prepared title certificates on the properties; and although he knew that when the transaction closed, the warranty deed would be recorded and Queen City would become titleholder of some sixteen properties that were to secure Commercial Bank's loan, his title certificates identified Wallace Rentals, LLC, as the record owner of those properties.  Valley Mobile Home Trailer Park, which was also collateral for the loan, was reflected as owned by The Management Group, LLC, which the Marshes also acquired in the transaction.

At the closing, the Marshes were presented with a deed of trust from Commercial Bank which identified Marsh Investment Group as grantor of a security interest to Commercial Bank in the referenced sixteen rental properties and Valley Mobile Home Trailer Park.  In fact, however, Marsh Investment Group did not own any of these properties, and the deed of trust was in error. Subsequently, in September 2006, Howell prepared and presented to Commercial Bank a final title certificate, which erroneously showed Marsh Investment Group as the titleholder for the subject properties and showed the bank had a first priority lien position. Thus, when the Marshes defaulted on their loan, Commercial Bank,

having failed to acquire a security interest in the properties, sought repayment from the Marshes under their personal guaranty.

The Marshes allege that Howell was negligent initially in failing to advise Commercial Bank at the time he prepared the original title certificates that as soon as the closing of the Marsh/Wallace transaction was funded, the warranty deed from Wallace Rentals to Queen City would be recorded and the record owner of the collateral would be Queen City (not Wallace Rentals). Whether or not he should have done this, however, is in the court's opinion ultimately immaterial, for it is unlikely that his having done so would have prevented the error. Commercial Bank did not erroneously identify the grantor as Wallace Rentals rather than Queen City; rather, it erroneously listed the grantor as Marsh Investment Group.[12]

Having said that, it is clear to the court that Howell was negligent in preparing the *final* title certificate erroneously identifying Marsh Investment Group (rather than Queen City, LLC) as the record owner of the properties and showing Commercial Bank has having a first deed of trust; and the court is persuaded that

---

[12] The Marshes argue in their post-trial brief that it was in their best interest for Howell to review (and that it was negligent for him to fail to review) the bank's deed of trust before allowing the Marshes to sign it (because had he done so, he presumably would have noticed that it erroneously listed Marsh Investment Group as the grantor, and he could then have advised that the grantor should be Queen City). However, plaintiffs did not identify this as a potential basis for liability in any of their complaints.

this negligence caused the Marshes harm.  There is ample evidence that Commercial Bank, had it been provided an accurate final title certificate, could easily have, and likely would have prepared and had the parties execute an amended deed of trust, that would have protected both its interest and the Marshes.  As a result of Howell's negligence in preparing the final title certificate, the bank did not correct its deed of trust, and this has proximately resulted in harm to the Marshes.

The court does recognize Howell's argument that causation is lacking, as it is speculative to conclude that the bank would have foreclosed on the properties rather than pursuing the Marshes' personal guaranty, since the bank had the option of how to proceed and was not required to pursue foreclosure first.  However, even if the bank would have had the right to pursue the personal guaranty rather than foreclosing, in the court's opinion, it is unlikely the bank would have elected to first seek payment from the Marshes on their personal guaranty if foreclosure had been an option.

As damages, the Marshes point out that in addition to having paid for Howell's erroneous title certificates, for which they contend they are entitled to reimbursement from Howell, they have incurred attorney's fees and costs seeking a settlement with Commercial Bank and defending the bank's claims against them on their guaranty, damages which they submit are directly

attributable to Howell's negligence. The court agrees, and concludes they are entitled to recover these costs. Finally, the Marshes maintain they are entitled to recover whatever amount they are ultimately required to pay to Commercial Bank based on their personal guaranty. In the court's opinion, however, the Marshes have not demonstrated that they have been harmed in this respect. The Marshes executed guarantees not only in favor of Commercial Bank but also in favor of Wallace. If Commercial Bank had a security interest in the collateral and a first lien position, as Howell had represented, Commercial Bank presumably would have foreclosed and its note would have been satisfied from the collateral. However, the note to Wallace would have remained unpaid and the deficiency owed to Wallace would presumably have been greater, and presumably by the same amount that the Marshes will owe Commercial Bank on their personal guaranty. In other words, the amount the Marshes will be required to pay on their guarantees should be no greater as a consequence of Howell's negligence than it would have been without any negligence on his part; the difference is the identity of the payee. In short, plaintiffs have failed to show that they have suffered an increased obligation as a result of Howell's negligence in this regard.

The Marshes have also alleged that Howell was negligent in failing to obtain estoppel certificates, by which Wallace's

tenants would have certified the terms and status of their leases, including the status of their rent payments (i.e., whether they were up to date or in arrears). The Marshes posit that this failure deprived them of "another opportunity to discover the truth about the state of Wallace's rental business." Particularly given the nature and scope of Wallace's rental business, the court is dubious that estoppel certificates were reasonably obtainable or would have proven genuinely informative or beneficial if provided. The court is not persuaded, therefore, that Howell's failure to obtain estoppel certificates was a breach of the standard of care under the circumstances. Moreover, the suggestion that Howell's actions deprived the Marshes of "another opportunity" to discover "the truth" about Wallace's rental business rings hollow. The Marshes were given many opportunities to investigate Wallace's rental business, and routinely failed to avail themselves of these opportunities. As they made little effort to investigate the facts for themselves, whether before or after contracting to buy Wallace's properties and/or businesses, their blithe ignorance cannot reasonably be attributed to Howell.[13]

_____

[13] Indeed, while it serves no purpose to dwell on the particulars, the court is compelled to observe that in its view, the Marshes' approach throughout this transaction can only fairly be characterized as lackadaisical. It was certainly less than duly diligent. The Marshes entered this nearly $5 million deal not only having less information that they ought have required, but *knowing* that they were unable to verify all the information they had been provided and *knowing* that they were not fully informed and yet proceeding forward without hesitation. They questioned little and accepted everything. The court thus does

The Marshes finally allege, and in the court's opinion have proven, that Howell was negligent in causing them to become double encumbered on certain of the properties that were included in their transaction with Wallace. In particular, the evidence establishes that the day following the "dry" closing in June, Howell presented to Russel Marsh for his signature three sets of promissory notes and accompanying deeds of trust as follows: In favor of Missy Wallace for $12,000 on property located at 3303 State Blvd., Meridian; in favor of Nell Wallace for $52,500 on properties located at 1814 and 1816 26th Avenue, Meridian; and in favor of Harold Wright for $21,000 for a one-half interest in property located at 1218 32nd Avenue, Meridian. Howell, along with Bubber Wallace, purported to explain to Russel that these papers needed to be signed so it would be clear that these properties, which they suggested were referenced in the Consent Order, were included in the transaction so as to prevent any problems with the Department of Justice. Russel understood this was merely a housekeeping matter, to "clean up" things, and he signed the papers. In fact, however, Bubber Wallace owned these properties, and these properties were included in the June 30 warranty deed from Wallace Rentals to Queen City (the ownership of which was acquired by the Marshes in their transaction with

---

not hesitate to conclude that Howell's failing to obtain estoppel certificates did not in any way contribute to their ignorance.

Wallace), and were also included in the note and deed of trust which the Marshes executed from Queen City to Bubber Wallace, on which Bubber Wallace has now foreclosed. All of these documents were prepared by John Howell. Howell also prepared the final draft of a general pledge agreement executed by the Marshes, which included a list of Wallace's existing debts that the Marshes were assuming in the transaction; the debts Wallace owed to Nell Wallace, Missy Wallace and Harold Wright for these properties were included in this list. And, Howell prepared a $4.9 million wrap-around promissory note in favor of Bubber Wallace based on the Marshes' agreement that they were assuming Wallace's liability for certain existing debts, and this note recited that the Marshes were agreeing to "[a]ssume liabilities for and promptly satisfy the notes and liens which the LLC and Mr. Wallace have heretofore executed to the following entities ... Nell C. Wallace ...Priscilla Wallace." Although the debt to Wright was not listed specifically in this note, it was included in other documents as a debt of Wallace's that the Marshes were assuming. Clearly, the Marshes, based on documents prepared by Howell, assumed Wallace's debts for these properties, just as they did his debts on other properties. Yet based on documents prepared by Howell, the Marshes also became indebted directly to Nell Wallace, Missy Wallace and Harold Wright for these properties.[14]   And the Marshes

_____

[14]   The court notes that Bubber Wallace testified that he owed his mother for the property he had acquired from her, and

59

have now been sued herein on counterclaims by Harold Wright and the Estate of Nell Wallace for the amount of these separate promissory notes.[15]  The Marshes submit that they are entitled to indemnity from Howell for any amounts they are found to be liable for on these promissory notes.

In defense of the Marshes' claim, Howell states that he prepared the notes and deeds of trust to Missy Wallace, Nell Wallace and Harold Wright because there was no recorded instrument that acknowledged the debt owed to them.  And, he contends that the amounts reflected in the deeds of trust were subtracted from Wallace's equity so that, in fact, the Marshes did not become "double encumbered" or "double indebted" on these properties.  In the court's opinion, the fact that there was no recorded instrument evidencing Bubber Wallace's indebtedness to Missy Wallace, Nell Wallace and Harold Wright on these properties is ultimately immaterial to the Marshes' charge of negligence herein.  Moreover, his contention that the computation of Wallace's equity that the Marshes were assuming did not include the amount of these

_____

also that he owed Missy Wallace and Harold Wright for the properties he had acquired from them immediately prior to the Marsh transaction; and he stated that he planned to pay off these debts with the money he got from the Marshes at the closing. Based on his testimony, it was not Wallace's intention that the Marshes would assume these debts directly.  And yet, this is precisely what Howell had them do, in addition to having them assume liability to Wallace for these same debts.

[15]  Missy Wallace has not counterclaimed against the Marshes on their promissory note to her, as she purportedly has already foreclosed on the deed of trust executed in her favor.

debts is not supported by any documentary evidence, but rather only his testimony that this was done.  In the court's view, the documentary evidence of record, most of which was generated by Howell himself, indicates that the Marshes were double encumbered, and as there is no documentary proof to the contrary, the court accepts that this, in fact, occurred.  Therefore, if the Marshes are properly to be held liable to Wright and the Estate of Nell Wallace on the promissory notes prepared by Howell, then they are entitled to indemnity from Howell.[16]

That brings the court to the Marshes' claim that they are entitled to be relieved from any liability on the subject promissory notes on the ground of mutual mistake, and on the counterclaim asserted against the Marshes to recover on their promissory notes.  The Marshes have stated their position on their mutual mistake claim simply as follows: they cannot be liable to Missy Wallace, Nell Wallace and Harold Wright for one debt on the properties and also be liable to Bubber Wallace for the same debt on the same properties; and, they submit that since they clearly never intended to assume a new debt in favor of Missy Wallace, Nell Wallace and Harold Wright as part of their transaction with Bubber Wallace, and since the execution of the promissory notes and deeds of trust accomplishing this result was obviously done in

---

[16]    The court certainly agrees that Howell was negligent but does not find that he was grossly negligent.  Therefore, the court will deny plaintiffs' request for punitive damages.

61

error, then they are entitled to rescission of these promissory notes and deeds of trust, or for reformation of those documents on the ground of mutual mistake.  In the court's opinion, however, while the plaintiffs' execution of the subject documents was the result of a mistake on their part and is certainly unfortunate, it does not amount to a mutual mistake under the law such as would authorize relief from the agreements they signed.

The Mississippi Supreme Court has held that "[a] contract may be set aside ... where both parties at the time of the agreement were operating under a mutual mistake of fact," White v. Cooke, 4 So. 3d 330, 334 (Miss. 2009), or alternatively, such relief "may be permissible ... when 'the error has arisen by the unilateral mistake of one party and that mistake is accompanied by evidence of some sort of fraud, deception, or other bad faith activity by the other party that prevented or hindered the mistaken party in the timely discovery of the mistake,'" Covington v. Griffin, No. 2008-CA-00275-COA, 2009 WL 3260548, at 7 (Miss. Ct. App. Oct. 13, 2009) (citation omitted).  Plaintiffs herein do not allege any sort of fraud or deception on the part of Missy Wallace, Nell Wallace or Harold Wright that led to their executing the promissory notes and deeds of trust and hence do not seek relief on the basis of unilateral mistake.  Rather, they allege only mutual mistake; but this, they cannot establish, for to prove mutual mistake, plaintiffs must prove that the notes and deeds of

trust did not accurately reflect the intentions of both parties. See Covington, 2009 WL 3260548, at 7 (citing Brown v. Chapman, 809 So. 2d 772, 773 (Miss. Ct. App. 2002)). Plaintiffs have offered no evidence of any sort relating to the understanding or intention of Nell Wallace, Missy Wallace or Harold Wright regarding the notes and deeds of trust. They have shown only that they themselves never intended to become liable twice for the same debts. They therefore are not entitled to relief on the basis of mutual mistake. Accordingly, the notes and deeds of trust are enforceable; and as the properties that are the subject of the deeds of trust have been foreclosed, then Harold Wright and the Estate of Nell Wallace are entitled to recover on their promissory notes from the Marshes. However, for their liability on these notes, plaintiffs are entitled to indemnity from defendant Howell.[17]

---

[17] The court notes that whereas the Marshes had asserted a claim against Howell for negligence on account of his alleged failure to ascertain the correct amount of past taxes due on the properties, they have apparently now abandoned that charge, presumably in view of the evidence that there was no error in Howell's information and computation, but rather the error was in the chancery clerk's application of the taxes paid at closing to incorrect properties. However, the Marshes now appear to claim that Howell was negligent in failing to question the chancery clerk's original explanation as to why additional taxes were due and to discover the chancery clerk's error was the true reason for the shortfall. The court finds no negligence in this regard. Howell had no reason to disbelieve the explanation the chancery clerk had offered and hence no reason to investigate further. Nor was he ever asked to do so.

Based on all of the foregoing, it is ordered that all plaintiffs' claims against Alden "Bubber" Wallace, Priscilla "Missy" Wallace and Richard O'Dom are dismissed with prejudice. Further, the court having found that plaintiffs have established claims against John Howell for breach of fiduciary duty and for negligence, are entitled to recover damages consisting of the attorneys' fees of $19,425 paid to Howell upon closing; any charge for the erroneous final title certificate; attorneys' fees and expenses incurred by plaintiffs in settlement negotiations with Commercial Bank and in defense of Commercial Bank's action against them on their personal guaranty; and the amount of plaintiffs' liability to Harold Wright and the Estate of Nell Wallace on their promissory notes, which is $21,000 and $52,500, respectively, plus interest. Plaintiffs shall have ten days within which to submit evidence substantiating the total amount of damages claimed, following which Howell shall have ten days to respond in opposition to such proof.

It is further ordered that counter-claimants the Estate of Nell Wallace and Harold Wright are entitled to judgment against plaintiffs on their promissory notes.

SO ORDERED this 20th day of October, 2009.


/s/ Tom S. Lee
UNITED STATES DISTRICT JUDGE